IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYNTHIA RIDDICK, on behalf of I.J.B., a minor,[1] | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-648-GMS |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM

**I.  INTRODUCTION**

This action arises from the denial of Cynthia Riddick's ("Riddick") claim for Social Security disability benefits. Riddick, the plaintiff, applied on belhalf of her son ("I.J.B.") for Supplemental Security Income under Title XVI of the Social Security Act (the "Act") on November 16, 2004. Title XVI, 42 U.S.C. § 1381-1383f. In her application, Riddick claimed that her son became disabled due to a learning disability and behavioral problems on November 16, 2004. (Tr. at 68.) After the Commissioner denied the application initially and on reconsideration, Riddick requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 36-51.) Following the hearing, on June 15, 2006, ALJ Edward J. Banas ("Banas") issued a written opinion denying Riddick's application for supplemental income. Specifically, ALJ Banas found that, although I.J.B. has borderline intellectual functioning and attention deficit hyperactivity disorder ("ADHD"), he is able to adequately function in school and at home and, therefore, not disabled. (*Id.* at 14-23.) Riddick requested a review of the

---

[1]The court will abbreviate the name of the minor child to project I.J.B.'s privacy.

ALJ's decision by the Appeals Council, which denied review on August 24, 2006. Upon that denial, the Commisioner's decision became final. (*Id.* at 7-10.) On October 20, 2006, Riddick filed a timely appeal with this court. Currently before the court are the parties' cross-motions for summary judgment. Because the court finds that the ALJ's decision meets the substantial evidence test established by 42 U.S.C. § 405 (g), it will deny Riddick's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision of the ALJ.

## II.   BACKGROUND

I.J.B was born on May 8, 1998, and was a six-year-old boy attending school when his mother, Riddick, filed for SSI on November 16, 2004. (Tr. 14-17.) Riddick's claim stems from her son's borderline intellectual functioning and ADHD, as well as his academic and disciplinary issues in late 2004. (*Id.* at 68, 83-89, 100, 111). In early 2005, an evaluating psychiatrist at Delaware Guidance Services for Youth, Inc. ("Delaware Guidance") started I.J.B. on the medications Adderall and Risperdal. (*Id.* at 292.) After beginning medication, I.J.B.'s learning and behavior problems improved significantly. (*Id.* at 102.) Despite the improvement, Riddick claims that her son is disabled under the SSA. (*Id.* at 318-33.) To be eligible for SSI, Riddick must demonstrate that her son is disabled within the meaning of section 1614(a)(3)(C) of the SSA. (*Id.* at 14.)

### A.   Evidence Presented

To support her claim, Riddick produced I.J.B.'s medical and school records, including state agency evaluations, psychiatric evaluations, school psychiatric and teacher evaluations, report cards and parent evaluation forms. The court will summarize these records.

#### 1.   State Agency Evaluations

In October 2004, I.J.B.'s elementary school recommended he receive a psychiatric evaluation

at Delaware Guidance. (Tr. 291-92.) I.J.B.'s history included problems with hyperactivity, stuttering, anxiety, shyness, aggression, and occasionally hearing a "voice telling him to do bad things." (*Id.* at 291.) While he appeared hyperactive in the waiting room before the evaluation, he did not demonstrate any evidence of hyperactivity during the evaluation. (*Id.* at 292.) Delaware Guidance diagnosed I.J.B. with ADHD and a speech disorder. (*Id.*) The evaluating psychiatrists ruled out diagnoses of anxiety disorder, pervasive development disorder, and learning disorder. (*Id.* at 257, 292.) On the global assessment of functioning (GAF), I.J.B. was rated 30. A 30 GAF score indicates that I.J.B. suffered hallucinations or delusions and that his judgment and ability to communicate were seriously impaired. (*Id.*) Indeed, the assessment reflects I.J.B.'s general lack of ability to function in almost all areas. (*Id.*) As a result, Delaware Guidance prescribed Adderall and Risperdal to I.J.B. (*Id.*)

Delaware Guidance evaluated I.J.B. again in November 2004. The evaluation indicated that his behavior had improved since he began medication treatment. (*Id.* at 294.) His GAF score improved to 35, with a high of 55 in 2004. (*Id.*) The service met with I.J.B. again in December 2004 and, once again, reported improvement with medication. (*Id.* at 296.)

In March 2005, Delaware Guidance discharged I.J.B. for non-compliance with agency attendance standards. (Tr. at 289.) The discharge summary indicated that Riddick did not return phone calls and that I.J.B. attended a total of only five sessions in five months. (*Id.*) The discharge report also indicated that I.J.B.'s final status was "improved," and that his GAF was 45, with a high of 55 in the past year. (*Id.* at 289-90.)

Two Social Security Administration psychologists reviewed I.J.B.'s records in February and June 2005. (*Id.* at 271-76.) Both psychologists concluded that I.J.B. had a severe impairment due

3

to ADHD. They concluded nevertheless that I.J.B. was not medically or functionally disabled within the meaning of the Act. (*Id.* at 271.) The psychologists explained that medication enabled I.J.B. to attend and complete tasks, interact with and relate to others, and care for himself. (*Id.* at 273, 275.) The psychologists further noted that I.J.B.'s learning, attention, and social abilities each improved after he began medication. (*Id.* at 273.)

In March 2006, after the ALJ hearing, I.J.B. underwent a consultive psychological evaluation at the Delaware Disability Determination Service. (Tr. at 297.) The evaluation results indicated that I.J.B. had an IQ of 79, which evidences borderline intellectual functioning, and that his attention and concentration abilities fell within the normal ranges. (*Id.* at 300.) The evaluating psychologist, Joseph Keyes, Ph. D., ("Dr. Keyes") reported that the results of the evaluation demonstrated adequate cognitive functioning with no cognitive disorder. (*Id.*) Dr. Keyes rated I.J.B.'s GAF at 60, indicating moderate symptoms or functional defects. Further, he concluded that, based on the evaluation, I.J.B.'s ability to perform self-care and his adaptive behavior were normal and age appropriate. (*Id.* at 299.) Dr. Keyes also concluded that, based on I.J.B.'s history and the results of a form completed by Riddick, I.J.B. had ADHD and a conduct disorder. (*Id.* at 299-300.)

2. Psychiatric Evaluations

In June 2005, I.J.B began psychological treatment with Allen Weiss, M.D. ("Dr. Weiss"). (Tr. at 277.) Dr. Weiss diagnosed I.J.B. with ADHD and rated his GAF at 55, which indicates no more than moderate symptoms or moderate functional difficulties. (*Id.* at 281.) I.J.B. continued to see Dr. Weiss for ADHD and behavior problems through December 2005. (*Id.* at 283.) I.J.B.'s GAF rating did not change. (*Id.*)

   3.  School Psychiatric Evaluations, Teacher Evaluations, and School Records

On November 4, 2004, school psychologist, Sharon L. Greenly, M.A. ("Greenly") administered a psycho-educational assessment to I.J.B. (Tr. at 152-65.) I.J.B.'s full-scale IQ was 75, evidencing borderline intellectual functioning. (*Id.* at 154.) His word knowledge and psychomotor speed rated as average. (*Id.* at 155.) His reading, math and language skills indicated he was functioning between the kindergarten and first grade levels, which Greenly noted were "above expected levels for cognitive ability." (*Id.*) His language abilities fell within the normal range. (*Id.*) During a class observation, Greenly found that I.J.B. was focused forty-five percent of the time while completing a puzzle task. (*Id.*)

Overall, Greenly reported that I.J.B. was quiet and cooperative during his evaluation, and demonstrated good attention and responsiveness to questions. (*Id.* at 154-55.) Dr. Greenly concluded that I.J.B. was not learning disabled or emotionally disturbed under the State guidelines. (*Id.* at 155.) Because of his ADHD, however, Greenly opined that I.J.B. was eligible for an educational accommodation plan. (*Id.*)

In January 2005, the multi-disciplinary team at I.J.B.'s school met to discuss his learning and behavioral issues. (Tr. at 102.) The team concluded that he should not be classified as either emotionally or physically disabled due to his ADHD. (*Id.*) Their report indicated that, after beginning medication, I.J.B. demonstrated "enormous improvement" with regard to his self-control, as well as improvement in social and academic areas. (*Id.*) The multi-disciplinary team concluded that I.J.B. would be best off in a regular educational setting with a student accommodation plan that included new testing arrangements, different teaching strategies designed to improve his behavior, focus, testing, and organizational skills. (*Id.* at 125-26.)

In February 2005, I.J.B.'s classroom teacher, Margaret Weldin ("Weldin"), completed an evaluation form related to Riddick's application for SSI benefits. (*Id.* at 117.) The evaluation indicated that I.J.B. had serious problems with attention, completing tasks, interacting with others, and caring for himself when he was not on medication. (*Id.* at 119-22.) Weldin stated, however, that he was "the complete opposite when on meds." (*Id.*)

In March 2005, Weldin completed a report indicating that I.J.B. had made significant improvements since he began taking medication. (Tr. at 160.) Weldin commented that she loved working with I.J.B. and that he was an eager learner. (*Id.* at 160-163.) The report also indicated that I.J.B. was making very good progress in the areas of math and language arts. (*Id.*)

In Fall 2005, I.J.B. began regular first grade. He had a few incidents of disruptive behavior between October and December, behavior that his classroom teacher described as "very different from what I see every day." (*Id.* at 189.) His teacher noted that at the time of one of the incidents, Riddick had failed to give I.J.B. his morning medication. (*Id.* at 187.) I.J.B.'s first quarter report card indicated significant improvement since he began medication. (*Id.* at 199.) He achieved satisfactory or excellent marks in almost all areas, including work habits and social skills. (*Id.*) Hand writing neatness was the only subject for which I.J.B. received lower than a mark of satisfactory or excellent. (*Id.*)

    4.    Riddick's Parent Forms

Riddick supplied a number of parent forms in support of her application for SSI. With regard to I.J.B.'s disabilities, Riddick stated that her son stutters (Tr. at 83), has difficulty communicating (*id.* at 84), needs help bathing (*id.* at 88), struggles with criticism (*id.*), has a very short attention span (*id.* at 89), and "is an angry child [ ] and frustrated." (*id.*) In a parent rating evaluation of child

6

behavior, Riddick reported that I.J.B. had "clinically significant" levels of hyperactivity and conduct problems, functioned at "at risk" levels in the areas of atypicality, social skills, leadership skills, adaptability skills, and withdrawal symptoms, and had "average" level attention problems, depression, and somatization. (*Id.* at 100.) With regard to the side effects of I.J.B.'s medications, Riddick stated that they cause him stomach pains and headaches. (*Id.* at 111.)

### B.     Hearing Testimony

#### 1.     I.J.B.'s Testimony

At the hearing before the ALJ, I.J.B. testified that he enjoyed school, was able to take care of himself with the help of his mother, and that he did his homework every night. (Tr. at 312-14.) He also explained that he occasionally got into fights with his siblings and that he occasionally got into trouble in school; including on the day of the hearing, when he was prohibited from participating in recess for failing to listen in class. (*Id.* at 315-16.) I.J.B. also testified that he occasionally got into trouble on the bus for standing when he was supposed to be seated. (*Id.*) In response to questions about his medication, I.J.B. explained that he takes it every morning and evening, and that he took his medication on the day of the hearing. (*Id.*)

#### 2.     Riddick's Testimony

Riddick testified that I.J.B. was doing well academically, but that his behavior at school and at home was particularly bad. (*Id.* at 318-33.) She stated that her son throws objects at other children and, on one occasion, was suspended from the school bus for throwing a rock at another student. (*Id.* at 319.) She also stated that her son has trouble staying seated and that "he crawls under desks and just kicks the desk over and can't keep his hands to himself." (*Id.* at 320.)

Asked about I.J.B.'s ability in the area of acquiring and using information, Riddick stated that

her son was average. (*Id.* at 321.) In response to questions about I.J.B.'s ability to concentrate and complete tasks, she stated that he has significant trouble focusing and completing assignments. (*Id.*) In response to questions about her son's social skills, Riddick stated that I.J.B. did not get along well with other students or with his siblings, but did get along well with his mother. (*Id.*)

Riddick also testified that I.J.B. had difficulty sitting still, paying attention, and that "something is always bothering him." (*Id.* at 322.) She stated that none of the current treatments were helping his situation and that he required constant monitoring. (*Id.* at 331-333.) In response to questions posed by her attorney and the ALJ, Riddick testified about a few of I.J.B.'s behavioral incidents.[2] She described one incident in which he got into an altercation with a classmate. (*Id.* at 323.) She described another incident in which Delaware Guidance was called to the school to subdue I.J.B. after he started banging his head against a wall, kicking, and screaming. (*Id.* at 326.) She also testified that on one occasion, I.J.B. was on his way home from day-care when he threw a rock at a moving vehicle and shattered the passenger side window. (*Id.* at 331.) She said that a police officer observed the incident, but did not arrest I.J.B. (*Id.*) She also stated that I.J.B. hears voices that tell him to do bad things. (*Id.* at 329.)

### C. The ALJ's Findings

The ALJ follows a three-step process in determining childhood disabilities. *See* 20 C.F.R. § 416.924 (2004). In order to qualify for SSI benefits, the ALJ must determine that (1) the child is not engaged in substantial gainful activity, (2) the child has a medically determinable severe impairment, and (3) the impairment, meets, medically equals, or functionally equals the severity of

---

[2] Riddick, however, did not specify the dates on which the incidents occurred, or whether they occurred before or after I.J.B. began taking medication.

an impairment listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1, and that the impairment meets the durational requirement. *Id.*

To determine functional equivalence, the ALJ must "assess all functional limitations caused by the child's condition to determine if the impairment(s) is functionally equivalent in severity to any listed impairment that includes disabling functional limitations in its criteria." 20 C.F.R. § 416.926a(a). An impairment is functionally equivalent in severity to a listed impairment if it results in marked limitations in two domains of functioning, or an extreme limitation in one domain of functioning. 20 C.F.R. § 416.926a(d). The domains an ALJ analyzes are: (1) acquiring and using information; (2) attending and completing tasks, (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Based on the factual evidence and the testimonies of I.J.B. and Riddick, the ALJ determined that I.J.B. was not disabled and, therefore, was not eligible for SSI. The ALJ's findings are summarized as follows:

> 1. The claimant, a seven-year-old child has never engaged in substantial gainful activity.
>
> 2. The child has severe impairments: borderline intellectual functioning and ADHD.
>
> 3. The child's impairments do not meet or medically equal the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925, and 416.926).
>
> 4. The child does not have an "extreme limitation" in any domain of functioning, or a "marked" limitation in two domains of functioning, and does not functionally equal the severity of the listings.
>
> 5. The child has not been under a "disability," as defined by the Act, at any time from the alleged onset date through the date of the decision.

(Tr. at 17-22.) With regard to I.J.B.'s functioning, the ALJ determined he had less than marked impairments in acquiring and using information, attending and completing tasks, and interacting and relating with others. (*Id.* at 19-20.) The ALJ also concluded that I.J.B. had no limitations in moving about and manipulating objects, caring for himself, and health and physical well-being. (*Id.* at 21-22.) Finally, the ALJ found that Riddick's testimony concerning the intensity, duration, and limiting effects of I.J.B.'s symptoms was not credible. (*Id.* at 18.)

### III. STANDARD OF REVIEW

#### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refrain from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the court is able to determine that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

#### B. Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." See 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct.

206, 83 L.Ed. 126 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

Credibility determinations are the province of the ALJ, and should only be disturbed on review only if not supported by substantial evidence. *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

In this appeal, Riddick argues that the Commissioner did not have substantial evidence to support the denial of her application for SSI. Riddick first argues that the ALJ made reversible legal error by ignoring record evidence. Specifically, Riddick contends that the ALJ failed to consider evidence of I.J.B.'s conduct disorder, that the ALJ failed to consider the full import of the school records, and that the ALJ made unfounded conclusions regarding the efficacy of I.J.B.'s medication and the credibility of her testimony. Riddick also argues that the record evidence overwhelmingly supports a finding that I.J.B. is disabled within the meaning of the Act. The court disagrees.

After having considered the parties' arguments and submissions, the court finds that the ALJ properly considered all of the record evidence in arriving at his decision. The Third Circuit instructs

that the ALJ's decision, read as a whole, must illustrate "that the ALJ considered the appropriate factors in reaching the conclusion." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ is not required to discuss the record evidence in each section of his decision. *Id.* at 504-05. Furthermore, the Third Circuit has recognized that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on continuing observations of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir.1987)).

Here, the ALJ clearly gave adequate consideration to all of the relevant record evidence. Specifically, it is clear from the hearing transcript that the ALJ considered I.J.B.'s psychiatric reports, school psychiatric evaluations, state psychiatric evaluations, school records and medical reports, as well as witness testimony. While the ALJ did not explicitly refer to I.J.B.'s "conduct disorder" in his decision, he made a number of references to I.J.B.'s behavior and conduct issues in his decision.[3] (Tr. at 19-20.) Additionally, the ALJ's conclusions are supported by I.J.B.'s psychiatric reports, which consistently indicated that his academic abilities and behavior issues improved greatly after he began taking medication. The ALJ's statements regarding the efficacy of I.J.B.'s medication were not based on groundless speculation; rather, they were specifically supported by the opinions of two state agency psychologists, who reviewed I.J.B.'s records and opined that he had less than marked limitations. Additionally, the ALJ considered that I.J.B.'s teacher reported that I.J.B. did not have marked limitations when he took his medication.

The court also disagrees with the Riddick's contention that the ALJ's credibility assessment

---

[3]Notably, the "conduct disorder" diagnosis was made based on the results of a behavior evaluation form completed by Riddick and evaluated by a consulting psychiatrist who met with I.J.B. on only one occasion.

12

is vague and unfounded. Allegations of subjective symptoms must be supported by objective medical evidence. *See* 20 C.F.R. § 404.1529. Here, the ALJ concluded that I.J.B. had a medical condition that could reasonably cause some of the behavioral and educational problems his mother listed. The ALJ found, however, that Riddick's testimony that her son's conditions continued at a severe level after he began medication was not credible. While that finding is clearly supported by substantial evidence, there is a substantial dearth of evidence that supports Riddick's position.[4] The ALJ referred to specific psychiatric evaluations, school records, and teacher evaluations, which contradicted Riddick's testimony that, post medication, I.J.B.'s behavioral and educational issues remained severe. The evidence discussed in the ALJ's decision demonstrates that, after beginning medication, I.J.B. became an eager student, his behavior improved drastically, and his functional limitations were less than marked. Thus, given the substantial evidence demonstrating that I.J.B. had less than marked functional limitations, the ALJ properly concluded that Riddick's inconsistent testimony was not credible.

Finally, the court agrees with the Commissioner that there is substantial evidence supporting the ALJ's determinations regarding the efficacy of I.J.B.'s medical treatments, and the conclusion that I.J.B. is not disabled within the definition of the Act. Riddick specifically contends that the ALJ erred in assessing I.J.B.'s functional abilities in two domains: attending and completing tasks, and interacting and relating with others. Regarding the domain of attending and completing tasks, the ALJ referenced the weight of record evidence demonstrating that after beginning medication, I.J.B.'s focus and attention improved to a level that was "less than marked." Regarding the domain

---

[4]In addition, the ALJ had the opportunity to assess the witness' credibility during her testimony at the hearing.

of interacting and relating with others, the ALJ noted that, after beginning medication, I.J.B.'s behavior problems improved. Thus, the ALJ reasoned that I.J.B. had a less than marked limitation in interacting and relating to others. Given the foregoing analysis, the court concludes that the ALJ appropriately considered the substantial evidence demonstrating that, since November 2004, I.J.B. was not disabled within the meaning of the Act.

V.   **CONCLUSION**

For the aforementioned reasons, the court concludes that ALJ Banas' denial of SSI is based on substantial evidence. Accordingly, the court will deny the plaintiff's motion for summary judgment and grant the Commissioner's motion for summary judgment.

Dated: June 29, 2009

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYNTHIA RIDDICK, on behalf of I.J.B., a minor, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 06-648-GMS |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The plaintiff's motion for summary judgment (D.I. 17) is DENIED.

2. The defendant's motion for summary judgment (D.I. 19) is GRANTED.

3. The decision of the Administrative Law Judge is AFFIRMED.

4. The Clerk of the Court is directed to close this case.

Dated: June 29, 2009

CHIEF, UNITED STATES DISTRICT JUDGE